## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

DEVON M. STAPLETON,

                  Plaintiff,

                                 Case No. 3:19-cv-413-MMH-PDB

v.

CSX TRANSPORTATION, INC.,

                  Defendant.

_____/

## <u>ORDER</u>

**THIS CAUSE** is before the Court on Defendant's Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Doc. 20; Motion) filed on July 17, 2020.   In the Motion, Defendant CSX Transportation, Inc. (CSXT) requests that the Court enter summary judgment in its favor as to Count II of Plaintiff's Complaint pursuant to Rule 56, Federal Rules of Civil Procedure (Rule(s)).   <u>See</u> Motion at 1.   Plaintiff Devon M. Stapleton filed a Brief in Opposition to Defendant's Motion for Partial Summary Judgment (Doc. 25; Response), on August 12, 2020.   With leave of the Court, CSXT filed a Reply Brief in Support of its Motion for Partial Summary Judgment (Doc. 28; Reply), on September 1, 2020.   Accordingly, this matter is ripe for review.

## I.      Standard of Review

Rule 56 instructs that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Rule 56(a).   The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."   Rule 56(c)(1)(A).[1]   An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant.   Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).   "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary

---

[1]      Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary judgment motions."   Rule 56 Advisory Committee's Note 2010 Amends.

> The standard for granting summary judgment remains unchanged.   The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law.   The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."   Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

In citing to Campbell, the Court notes that "[a]lthough an unpublished opinion is not binding . . . , it is persuasive authority."   United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

judgment." Kesinger ex rel. Est. of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When the non-moving party bears the burden of proof on an issue at trial, the moving party need not 'support its motion with affidavits or other similar material negating the opponent's claim,' Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986), in order to discharge this initial responsibility." Gonzalez v. Lee Cnty. Hous. Auth., 161 F.3d 1290, 1294 (11th Cir. 1998). Instead, the moving party simply may demonstrate "that there is an absence of evidence to support the nonmoving party's case." Id.

"When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.   In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."   Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## II.   Background

### A.   Procedural History

On June 30, 2017, Stapleton filed an administrative complaint with the Occupational Safety and Health Administration (OSHA) Regional Director alleging CSXT engaged in retaliatory employment practices in violation of the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20109 et seq.   See Plaintiff's Original Complaint and Demand for Trial by Jury (Doc. 1; Complaint) at ¶ 17. The Secretary of Labor dismissed Stapleton's claims on February 14, 2019.   Id. at ¶ 18.   Stapleton appealed the Secretary of Labor's decision and requested that the appeal be heard by an Administrative Law Judge.   Id.   at ¶ 19.   On April 11, 2019, before the Secretary of Labor had issued a final decision, Stapleton filed his Complaint in this Court.   Id. at ¶ 20.

In the Complaint, Stapleton alleges that CSXT owes him damages under the Federal Employers Liability Act (FELA), 45 U.S.C. § 51, et seq. for an injury he suffered on the job (Count I), and that CSXT retaliated against him for

- 4 -

reporting a workplace injury in violation of the FRSA, 49 U.S.C. § 20109(a) (Count II).   See Complaint at 3, 4.   In the instant Motion, CSXT seeks entry of summary judgment in its favor as to Count II of the Complaint.   See Motion at 1.   CSXT argues that Stapleton cannot show that: (1) he suffered an adverse action, (2) any alleged adverse action was retaliatory, or (3) CSXT interfered with Stapleton's medical treatment in violation of 49 U.S.C. § 20109(c)(1).   See Motion at 13, 16, 22.   In his Response, Stapleton argues that a reasonable jury could find that Stapleton suffered an adverse employment action.   See Response at 9.   Stapleton also argues that an adverse action does not require retaliatory motive under the FRSA but even if it does, a reasonable jury could find CSXT had the requisite motive.   See id. at 13, 16-17.   Finally, Stapleton argues that CSXT interfered with his medical treatment in violation of 49 U.S.C. § 20109(c)(1) when it provided his health insurer with information that led to the temporary cancellation of his health insurance coverage.   See id. at 18.   In the Reply, CSXT elaborates on some of the arguments made in the Motion.   See generally Reply.   Both parties submitted record evidence in support of their respective positions.[2]

---

[2]   In support of its Motion, CSXT attached a variety of documents.   Those documents include Doc. 20-2 (Stapleton Deposition); Doc. 20-3 (Smith Deposition); Doc. 20-4 (Dr. Heligman Deposition); Doc. 20-5 (Gennette Deposition); Doc 20-6 (Sweatt Deposition).   In support of his Response, Stapleton attached Doc. 25-2 (Stapleton Declaration); Doc. 25-3 (FRA Reporting Guide); Doc. 25-4 (May 9, 2017 and June 6, 2017 Bayside Orthopaedic Records); Doc. 25-5 (Railroad Enrollment Services Letter); Doc 25-6 (June 19, 2020 Bayside Orthopaedic Records).

**B.    Facts[3]**

i.    **Stapleton's Injury Classification**

On April 28, 2017, Stapleton was working as a signalman for CSXT. Stapleton Deposition at 40.   That day, he was demonstrating how to "make an eye" for two junior employees.   Smith Deposition at 55, 100.   As he grasped a wire with Knipex pliers and rolled it back towards him, he felt a burning pain in his right elbow.   Stapleton Deposition at 69, 73.   According to Stapleton, the pain lasted around forty-five seconds to one minute.   Id. at 72. Immediately following the incident, Stapleton expressed to his foreman, Brad Houck, "that kind of hurt."   Id. at 73, 141.   When Houck asked if Stapleton was alright, Stapleton replied that he thought so.   Id. at 74. Houck further inquired whether Stapleton needed medical attention and Stapleton denied any such need.   Id. at 74, 77.   Houck was the only supervisor that Stapleton spoke to about the incident that day.   Id. at 74.   During the remaining hours of his shift, Stapleton performed his normal signalman duties.   Id. at 74-75.   Once he left the worksite, Stapleton and his team traveled to a pharmacy so he could purchase Ibuprofen and muscle cream to help with his symptoms.   Id. at 76.

---

[3]    The facts recited in this section are either undisputed, or any disagreement has been indicated.   Because this case is before the Court on CSXT's Motion, the facts recited, and all reasonable inferences therefrom, have been viewed by the Court in a light most favorable to Stapleton.   See T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F.Supp.2d 1337, 1340 (M.D. Fla. 2008).

The following day, while getting ready for work, Stapleton experienced the burning pain in his elbow again.   <u>Id.</u> at 81. This time, he decided to report the injury to CSXT supervisor, Darryl Ball.   <u>Id.</u> at 81, 83.   Ball directed another manager, Todd Alton, to contact Stapleton regarding the injury.   <u>Id.</u> at 84.   Stapleton described to Alton what happened, and Alton informed him that a report would need to be completed.   <u>Id.</u>   Ball advised Stapleton to take it easy that day, so Stapleton drove his team around the worksite.   <u>Id.</u> at 84-85. Ball also asked Stapleton if he needed medical attention or treatment and Stapleton once more, declined.   <u>Id.</u> at 85.

The next day, April 30, 2017, Stapleton reported to work in the morning as usual and continued to drive around with his team.   <u>Id.</u> at 86.   At some point during the workday, Tim Smith, the Regional Director of Signal Construction, contacted Stapleton about the incident. Smith and Stapleton discussed the incident, traveled to the site where it occurred, and filled out a PI-1A form together.   <u>Id.</u> at 86-87.   A PI-1A form is an "Employee's Injury and/or Illness Report" that is completed by CSXT employees in the presence of a manager as soon as practicable after an injury occurs.   <u>Id.</u>, Ex. 6.   Stapleton provided the following information on the form

Describe fully how the injury/illness occurred.

"After installing stepup transformers at BD635 I was asked for eyemakers and kleins.   Jarrod and Justin had never seen the Knipex eyemakers so I demonstrated how to make an eye on the

groundwire for the transformer.  As I was making the eye I felt pain and burning in my right elbow."

Did defective tools or equipment cause the incident?

"No."

Did working conditions cause or contribute to the cause of the accident/injury?

"No."

Is anyone at fault? If yes, to what extent?

"No."

Id. at 93, Ex. 6.  Stapleton's PI-1A form did not reflect whether Stapleton had sought any medical attention or prescriptions for his injury as of April 30, 2017. Id. at 98.  Like the other CSXT Supervisors, Smith asked Stapleton if he needed medical treatment and Stapleton declined once again.  Id. at 88. Stapleton recalled thinking that his elbow just needed a little bit of time so he continued to report to work until May 2, 2017, when his job at the current worksite was complete.  Id. at 88-89.

Stapleton first sought medical treatment for his elbow on May 4, 2017, about a week after the incident at the South Baldwin Regional Emergency Department.  Id. at 110.  Stapleton testified that Smith authorized South Baldwin to treat Stapleton that day.  Stapleton Declaration at ¶ 4.  In his deposition, Smith did not recall authorizing Stapleton's treatment but testified that he would have intervened to make sure Stapleton received medical care.

Smith Deposition at 137.   Medical professionals at South Baldwin performed a physical examination and obtained x-rays but the x-rays did not reveal any injury to Stapleton's elbow.   Stapleton Deposition at 110-11.   The examining physician prescribed medications and suggested that Stapleton follow up with Dr. Determann at Bayside Orthopaedic.   Id.

At the conclusion of his visit at South Baldwin, the examining physician instructed Stapleton that he could return to work with no restrictions.   Id. at 111-112.   Stapleton's discharge instructions reflected that he suffered a "[t]endon injury."   Id. at 208.   A nurse practitioner at South Baldwin signed a completed CJ-24 form for Stapleton to provide to CSXT.   Id. at 124.   When an employee requests medical treatment, the CJ-24 form is used to document the treating physician's initial report of the employee's injury or illness. Id., Ex. 9. In the box described as "History (Including Specific Location and Description of the Incident That Caused Injury, Onset of Illness)" the form stated, "right elbow pain - denies injury." Id. at 207, Ex. 9 (emphasis added). The box designated for "Diagnosis" stated, "[i]njury of muscle facia tendons of the forearm."   Id. at 124, 207, Ex. 9 (emphasis added).   Later that evening, Stapleton faxed the CJ-24 form, discharge instructions, and two documents reflecting his prescriptions to Smith.   Id. at 18-20, 208; Stapleton Declaration at ¶ 6-7.   By this point in time Stapleton contends that he had communicated to CSXT that he was hurt on the

job and CSXT had statements from Stapleton's team members regarding the incident.   Id. at 208.

As required by the FRSA, the Federal Railroad Association (FRA) maintains a railroad accident reporting system that applies to rail carriers like CSXT.   Sweatt Deposition at 16.   The FRA's regulations on reporting incidents under 49 C.F.R. § 225, ensure that the FRA receives "accurate information concerning the hazards and risks that exist on the Nation's railroads."   FRA Reporting Guide, Preface.   Although not legally required to do so, CSXT has implemented a voluntary policy to pay for the out of pocket expenses of employees who suffer an injury deemed to be a reportable injury under the FRA (an "FRA reportable" injury).   Dr. Heligman Deposition at 30-31.   As such, pursuant to CSXT policy, if a CSXT employee suffers an FRA reportable injury, the employee's medical providers can submit the invoices for the employee's copays and deductibles incurred from the subsequent medical treatment to CSXT and CSXT will pay those bills.   Id. at 31, 57.   The railroad carrier's Reporting Officer makes the ultimate decision on whether a specific incident is FRA reportable.   FRA Reporting Guide at 12.   However, in determining whether an employee has suffered an FRA reportable or non-FRA reportable injury, CSXT uses an internal committee that reviews relevant records and comes to an agreement on difficult reporting decisions.   See Sweatt Deposition at 21.

On the morning following Stapleton's hospital visit, May 5, 2017, Tuesdi Sweatt, a manager from CSXT's Compliance and Reporting Department, emailed CSXT's FRA Reporting Officer, Geoff Aughenbaugh, and Chief Medical Officer, Dr. Craig Heligman, inquiring whether Stapleton suffered an FRA reportable injury based on the PI-1A and the CJ-24 forms. See Dr. Heligman Deposition at 10; Sweatt Deposition at 92.   Dr. Heligman is also on CSXT's committee for injury review for FRA reportability.   Dr. Heligman Deposition at 10.   Sweatt asked

> Can you advise your thoughts on this one? EE on CJ-24 states "right elbow pain-denies injury", diagnosis is "injury of muscle facia tendons forearm." The PI-1A is also attached for your review.

Sweatt Deposition at 197, Ex. 8.

In response, Aughenbaugh and Dr. Heligman agreed that Stapleton's incident should remain classified as non-FRA reportable subject to committee review.   Sweatt Deposition, Ex. 8.   Sweatt replied that she hoped to rely on the comment, "denies injury" in the CJ-24 form as a basis for keeping the incident non-FRA reportable without the need for committee review.   Sweat Deposition at 92, Ex. 8.   Aughenbaugh agreed.   Id.   Thus, as of May 5, 2017, CSXT's initial classification of Stapleton's incident was non-regulatory, on-duty, non-FRA reportable.   See Dr. Heligman Deposition at 25.   This meant that Stapleton's injury did not meet the FRA reportability requirements even though it did occur on-duty.   Id.

Regarding reportability, there is a distinction between whether the injury is on-duty or off-duty, and whether it is FRA reportable or non-FRA reportable. Id. In his deposition, Dr. Heligman provided an example to illustrate the difference between an on-duty injury that would be FRA reportable and one that would be non-FRA reportable:

> If an individual is in the course of doing regular work, and they report an injury, then the injury needs to meet certain requirements in order for it to be reportable.   It's not just when you experience pain on the job.
>
> So, we would have to look at what treatment was provided and temporal factors and timing of the events as they occurred.
>
> If someone were to, say, have a chronic pain problem to begin with, and they brought that condition to work, and experiences pain at work, the question is, was there a new incident that led to an exacerbation and/or aggravation of something preexisting, or is this the normal pattern of pain experienced.   That's one example.
>
> If they receive treatment or lose time as a result of the injury, that can make it an FRA reportable incident.
>
> If the individual reports an event, does not receive treatment or only first aid, and that first said [sic] is defined in the regulatory guidance, they do not lose time, then it would be considered non-reportable.

Id. at 27-28.   Sweatt further explained that in determining reportability, CSXT must evaluate whether a work-related event is a discernible cause of the injury, not something the employee brought to the work environment.   Sweatt Deposition at 34.   Notably, Section 1.3.3 of the FRA's Guide for Reporting Decisions states, "if there is an uncertainty as to whether to report an

accident/incident, it is recommended that a report be made."   FRA Reporting Guide at 12.

On May 7, 2017, Stapleton, via text, informed Smith that he was not doing better and asked for Smith's opinion on Stapleton seeing an orthopedist. Stapleton Declaration at ¶ 8.   Smith expressed that he was sorry about Stapleton's condition and encouraged Stapleton to do what he needed to get better.   Id.   On May 8, 2017, Stapleton attempted to schedule an appointment at Bayside Orthopaedic, but was told that the office could not see him without an authorization from CSXT.   Id.   This prompted Stapleton to seek assistance from CSXT's medical department.   Id.   Ultimately, Johnny Delk who Stapleton identifies as the "nurse medical manager for the western region" discussed the process of getting an appointment to be seen by an orthopedic physician with Stapleton.   Id.; Stapleton Deposition, Ex. 10; Stapleton Declaration at ¶ 9.   Delk prepared a case progress note documenting his conversation with Stapleton

> Event is listed as non-regulatory, on-duty, non-FRA.   Explained to [employee] that Safety will need to review the ER medical info. Provided fax number and encouraged [employee] to fax all available medical info to this office.   [Employee] reports that he has UHC as primary insurance carrier.   Explained to [employee] that he should provide his UHC insurance card to all med providers.   Explained to [employee] that he will be contacted by this office if his case is updated to an on-duty, FRA reportable event.   Encouraged [employee] to follow up with his supervisor.   [Employee] verbalized understanding and agrees with plan.

Id.

After his conversation with Delk, Stapleton spoke to Smith on the phone and was seen at Bayside Orthopaedic the following day.   Stapleton Declaration at ¶ 10.   After Stapleton's May 9, 2017 appointment, Delk communicated to him that Kelly Caudill, with the CSXT Medical Department, would be "handling [his] case until it was upgraded to reportable."   Id. at ¶ 11. Stapleton forwarded the following documents to Caudill: a return to work light duty letter from Dr. Determann at Bayside Orthopaedic, the CJ-24 form, discharge instructions from South Baldwin, and a prescription from Dr. Determann.   Stapleton Deposition, Ex. 11.   The substantive medical records from South Baldwin were not included in the faxed documents.   Id. at 125-26. Other than these medical documents and a COII form, Stapleton does not recall if he personally sent any other medical records to CSXT before July 25, 2017. Id. at 126.   When Stapleton reached out to Caudill to discuss his situation, she referred him to Sweatt. Stapleton Declaration at ¶ 12.

Stapleton called and emailed Sweatt on May 15, 2017, and she returned his call two days later. Id. at ¶ 13. When Stapleton inquired about the reportability of his injury, Sweatt advised him that his incident would be up for review with the Safety and Medical Department.   Stapleton Deposition at 127; Stapleton Declaration at ¶ 13.   That same day, Sweatt emailed Aughenbaugh explaining that she spoke with Stapleton and was going to prepare his incident

for committee review.   Sweatt Deposition at 89.   On May 23, 2017, Sweatt again asked Dr. Heligman for his opinion regarding the FRA reportability of Stapleton's incident.   Dr. Heligman Deposition at 118.   The next day, Dr. Heligman responded that it was "hard to say" and suggested that Sweatt request further records before a committee review.   Id. at 118-119.   A day later, on May 25, 2017, Sweatt sent a medical records request to South Baldwin Regional Medical Center and Bayside Orthopaedic.   Sweatt Deposition at 55, Exs. 11,12.   Sweatt received the complete South Baldwin Emergency Department records on June 29, 2017, but noted in Stapleton's file that she was still awaiting "ortho records."   Sweatt Deposition at 62-63, 72.

On July 3, 2017, Robert Crawford from the FRA first contacted CSXT to obtain additional documentation pertaining to Stapleton's incident.   Sweatt Deposition, Ex. 6(a).   Sweatt provided Crawford with a F6180.98 form on July 10, 2017.   Id.   An F6180.98 is a non-reportable injury form that CSXT had signed on April 29, 2017, and kept in Stapleton's file.   Sweatt Deposition at 26-27.   Sweatt informed Crawford that CSXT had not made a final decision about Stapleton and was still awaiting medical records.   Sweatt Deposition, Ex. 6(a).   Crawford expressed that he understood.   Id.

On July 25, 2017, Sweatt apprised Dr. Heligman of the FRA's request and emailed Dr. Heligman Stapleton's hospital records.   Dr. Heligman Deposition, Ex. 14.   She also forwarded Dr. Heligman Stapleton's orthopedic records that

CSXT had since received.   Id. at 72, 88-89   Sweatt recommended that the committee conduct a review of Stapleton's case as long as Dr. Heligman thought that they finally had the requisite information to make a decision.   Id., Ex. 14. Stapleton's incident, along with four others, went to the committee for review. Sweatt Deposition, Ex. 5.   On July 26, 2017, the committee, on Dr. Heligman's recommendation, updated the classification of Stapleton's incident to FRA reportable.   Id. at 36.   Sweatt notified Crawford of the change and explained, "[w]e only had a CJ-24 that had no lost time, and that stated the 'employee denied' injury, so therefore we felt we needed further medical records to make an informed decision."   Id., Ex. 6.

As a result of CSXT initially classifying Stapleton's injury as non-FRA reportable in the beginning of May, Stapleton incurred out of pocket copays and deductibles amounting to a total of $1,200.   Stapleton Deposition at 149. CSXT informed Stapleton that CSXT's Medical Department would reimburse these out-of-pocket expenses if he followed the applicable procedures.   Id. at 150.   Despite this offer from CSXT, Stapleton did not seek reimbursement because he felt the procedure was excessive and "doesn't seem right."   Id. at 150-51.   Stapleton's understanding of the procedure was that all of his doctors and health care providers would have to submit their bills to CSXT, CSXT would pay the providers, and Stapleton could then seek reimbursement from his providers of the amounts he previously paid.   Id. at 151.   CSXT can only

reimburse Stapleton if his medical providers submit invoices directly so that CSXT has "the proper documentation to submit to the insurance company." See Dr. Heligman Deposition at 115.  Had Stapleton's injury been classified as FRA reportable at the outset, his medical providers still would have been required to submit invoices to CSXT before CSXT would have undertaken paying for Stapleton's copays and deductibles.   Id. at 31. Dr. Heligman maintains that without this process, "any employee at any moment in time could send an invoice for whatever amount they want, here, CSX[T], pay his bill; [CSXT] won't know that it was for an on-duty injury or not."  See id. at 113.

### ii.      Temporary Cancellation of UHC Insurance Coverage

On or around May 9, 2017, Stapleton began taking medical leave from CSXT as a result of the April 28, 2017 incident.   Stapleton Deposition at 113. He did not notify CSXT's payroll department that he was taking medical leave because according to Stapleton, CSXT did not communicate to him that it was his responsibility to do so.  Id. at 115-116.  In a letter dated June 15, 2017, UHC's Railroad Enrollment services advised Stapleton that his health insurance coverage had been cancelled.  Id. at 136-37; Gennette Deposition, Ex. 5; Response at 6.  According to the letter, Stapleton's health insurance coverage with UHC ended on May 31, 2017.  Gennette Deposition at 38-39. CSXT's Senior Manager of payroll, Paula Gennette, described the

circumstances surrounding the cancellation of Stapleton's health insurance coverage in her deposition

> In terms of UHC coverage, if you are listed as an HR status as active in our system and the employee does not make the company aware that they are on a leave of absence and your status isn't changed, if you have no pay within the month and are still listed in an active status, UHC denotes you as not being eligible for coverage.   In Mr. Stapleton's case, UHC said there was no break in benefits.

Id. at 6.   CSXT sends a file to UHC listing which employees are eligible for coverage.   Id. at 27-28.   Because Stapleton was an active employee without pay in the payroll system, instead of on leave, Stapleton was listed as ineligible. Id.

On June 20, 2017, Dr. Determann suggested that Stapleton undergo surgery on his right elbow. Stapleton Deposition at 163-64, 230.   The surgery would be an outpatient procedure and was to be "set up at [Stapleton's] convenience."   Id. at 163.   On June 30, 2017, Stapleton reached out to several CSXT employees to notify them that his health insurance coverage was cancelled.   See Gennette Deposition at 28; Stapleton Deposition at 137-38. Stapleton delayed his surgery because he did not have the means to pay for it without his health benefits from CSXT.   Stapleton Deposition at 136.

According to Genette, CSXT immediately took steps to reinstate Stapleton's health insurance coverage with UHC.   Gennette Deposition at 27-28; Smith Deposition at 41.   Indeed, once Stapleton had notified CSXT of the

issue, it was resolved in about a day.   <u>See</u> Smith Deposition at 140.   A union representative contacted Stapleton to tell him that his insurance coverage had been restored.   Stapleton Deposition at 139.   According to UHC, Stapleton's coverage was retroactively reinstated resulting in no break in coverage. Gennette Deposition at 21.   Nevertheless, because his health insurance was temporarily cancelled, Stapleton had to delay his surgery by a week to ten days. Stapleton Deposition at 139.   The surgery ultimately occurred on July 5, 2017, 15 days after Dr. Determann first recommended Stapleton undergo the surgical procedure.   <u>Id.</u> at 135, 230.

## III.   Discussion

### A.   Interference with Medical Treatment under 49 U.S.C. § 20109(c)(1)

Before addressing the merits of Stapleton's claims, the undersigned first identifies which claims under the FRSA are properly before the Court.   In the Motion for Summary Judgment, CSXT notes that Stapleton makes a conclusory statement that CSXT "interfered with [his] medical treatment."   Motion at 22 (quoting Complaint at ¶ 33).   Then, in what appears to be an abundance of caution, CSXT proceeds to argue that it is entitled to summary judgment as to this claim.   In doing so, when identifying the relief it seeks, CSXT requests "this Court [] grant summary judgment as to <u>any claim</u> by Plaintiff that CSXT denied, delayed, or interfered with Plaintiff's medical treatment," as opposed to

affirmatively acknowledging that a claim for interference with medical treatment is pled in the Complaint.   See id. at 24 (emphasis added).

Upon careful review of the Complaint, the Court determines that Stapleton failed to present the Court with a claim that CSXT interfered with his medical treatment in violation of 49 U.S.C. § 20109(c)(1).   In his Complaint, Stapleton sets forth two "Causes of Action."   See generally Complaint.   He entitles the first as "Count One: FELA Injury Claims (45 U.S.C. § 51, et seq.)" and the second as "Count Two: Retaliation Claims (49 U.S.C. § 20109(a))."   Id. at 3, 4.   In Count Two, Stapleton asserts that he engaged in a protected activity that contributed to "the following adverse actions taken by CSX[T] . . ."

(a)   determining that Plaintiff's April 28, 2017, on-the- job injury was not work related;

(b)   forcing Plaintiff to use his personal health insurance thereby requiring him to pay certain copays and deductibles that would have otherwise been paid by CSXT had they determined his on-the-job injury to be work-related.

Id. at ¶ 35.   He asserts that he suffered damages as a result of those actions. Id. at ¶ 36.   While in identifying the damages he seeks for the retaliation claim in Count Two, Stapleton asserts that he "seeks damages for retaliation, embarrassment and interference with medical treatment and intimidation pursuant to the FRSA" nowhere does he suggest that he is asserting a separate claim for interference with his medical treatment under 49 U.S.C. § 20109(c). See id. at ¶ 33.

Notably, 49 U.S.C. § 20109 provides three distinct protections for railroad employees.   In subsection (a), the provision cited by Stapleton, the statute generally prohibits a railroad employer from discriminating against an employee who engages in protected activity.   See 49 U.S.C. § 20109(a).   In subsection (b), the statute protects employees against discrimination or retaliation in connection with concerns regarding "Hazardous Safety or Security Conditions."   See 49 U.S.C. § 20109(b).   And in subsection (c), the statute prohibits a railroad carrier from delaying or interfering with medical treatment of an employee injured in the course of employment and prohibits the railroad from disciplining an employee for seeking medical treatment.   See 49 U.S.C. § 20109(c).   Each of these subsections addresses specific distinct conduct by both the employee and the railroad employer.

Notably, Stapleton did not cite or otherwise mention 49 U.S.C. § 20109(c)(1), the relevant provision prohibiting interference with medical treatment under the FRSA, anywhere in his Complaint.   See generally Complaint.   Indeed, in Count Two, he specifically cites only to § 20109(a), asserts that he engaged in protected activity, and identifies the ways in which CSXT retaliated against him for doing so in violation of § 20109(a).   Id. at 4-5. Nothing in this count suggests a violation of subsection(c)(1).   Moreover, because subsection (c)(1) of § 20109 governs conduct different than that prohibited in subsection (a), if Stapleton meant to plead these two different

causes of action he would have needed to plead them in different counts.   See Weiland v. Palm Beach Cnty. Sheriff's Off., 792 F.3d 1313, 1322-23 n. 13 (11th Cir. 2015) (collecting cases).   Indeed, Rule 10(b), requires that: "[i]f doing so would promote clarity, each claim founded on a separate transaction or occurrence...must be stated in a separate count or defense." See Rule 10(b); see also Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll., 77 F.3d 364, 366 (11th Cir. 1996) (explaining that a properly drawn complaint "will present each claim for relief in a separate count, as required by Rule 10(b), and with such clarity and precision that the defendant will be able to discern what the plaintiff is claiming and to frame a responsive pleading" (internal footnote omitted)).

More importantly, the facts which Stapleton contends support his interference with medical treatment claim are entirely absent from the Complaint.   See generally Complaint.   In opposing CSXT's Motion, Stapleton argues that CSXT interfered with and delayed his medical treatment when it provided UHC with information that led to the temporary cancellation of his health insurance coverage and delayed his surgery.   See Response at 19. However, nowhere in the Complaint does Stapleton allege that CSXT reported him as ineligible for health care benefits, nor does he allege that his health insurance benefits were terminated at any time.   See generally Complaint. To the contrary, Stapleton unequivocally states that he and his family had health insurance coverage.   See id. at ¶ 13 ("Plaintiff, as part of his employee

benefits, had health coverage for his wife and himself."). Stapleton also alleges that CSXT acted improperly by forcing him to use his health insurance coverage, not that CSXT caused his health insurance benefits to be terminated.[4] Also, Stapleton never alleges that he had to have surgery much less that his surgery had to be delayed as a result of the temporary cancellation of his insurance benefits. In sum, none of the facts on which Stapleton relies to argue that he has presented a claim that CSXT interfered with his medical treatment in violation of § 20109(c)(1) are actually set forth in the Complaint.

Eleventh Circuit precedent precludes a plaintiff from amending its complaint through argument at the summary judgment phase of the proceedings. See Flintlock Constr. Servs., LLC v. Well-Come Holdings, LLC, 710 F.3d 1221, 1228 (11th Cir. 2013); see also Miccosukee Tribe of Indians of Fla. v. United States, 716 F.3d 535, 559 (11th Cir. 2013) (explaining that the district court improperly disregarded the allegations of the complaint and, in effect, treated the complaint as though it had been amended to conform to statements in the plaintiff's response to the summary judgment motion). For example, in Flintlock, the Eleventh Circuit criticized a district court for addressing a plaintiff's argument for insurance coverage based on estoppel,

---

[4]    "Forcing Plaintiff to use his health insurance coverage and pay said out-of-pocket costs, was an illegal, improper adverse act within the meaning of the FRSA and was threatening, retaliatory and done to intimidate Plaintiff and others so that Plaintiff and others would not report accidents and injuries in the future."   Complaint at ¶ 14.

even where the defendant did not object, because the claim was first raised at summary judgment and not included in the complaint.   710 F.3d at 1226-28 ("This Court's precedent foreclosed [plaintiff's] attempt to amend its complaint at the summary judgment stage without seeking leave of court pursuant to Rule 15(a)(2).").   Here, Stapleton's argument that CSXT interfered with his medical treatment under 49 U.S.C. § 20109(c)(1) is an improper attempt to amend the Complaint at summary judgment.   Id. at 1228; see also Merle Wood & Assocs., Inc. v. Trinity Yachts, LLC, 714 F.3d 1234, 1238 (11th Cir. 2013); GeorgiaCarry.Org, Inc. v. Georgia, 687 F.3d 1244, 1258-59 (11th Cir. 2012); Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1314-15 (11th Cir. 2004) ("A plaintiff may not amend [its] complaint through argument in a brief opposing summary judgment."); Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1296 (11th Cir. 2006).

The Eleventh Circuit Court of Appeals' recent decision in Monaghan v. Worldpay US, Inc., is particularly instructive here.   See 955 F.3d 855, 859 (11th Cir. 2020).   In Monaghan, the Eleventh Circuit prohibited the plaintiff from adding retaliation claims at summary judgment when she only pled claims under the anti-discrimination provisions of the applicable statutes in her complaint.   Id.   In the defendant's motion for summary judgment, the defendant proceeded as if the plaintiff had plead retaliation claims under 42 U.S.C. § 1981 (§ 1981) and the Age Discrimination in Employment Act (ADEA),

29 U.S.C. § 623 <u>et</u> <u>seq.</u>, in addition to Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e <u>et</u> <u>seq.</u> and sought summary judgment as to those claims.   <u>See</u> Defendant's Memorandum of Law in Support of its Motion for Summary Judgment at 1, 23, <u>Monaghan v. Worldpay US, Inc.</u>, No. 1:16-CV-0760-CC (N.D. Ga. 2017) (Doc. 54) ("Plaintiff alleges . . . that she was subjected to retaliation for allegedly reporting age and race discrimination.").   In response, the plaintiff similarly proceeded as if she had asserted these retaliation claims in the operative pleading.   <u>See</u> <u>Monaghan</u>, 955 F.3d at 859. On appeal, the Eleventh Circuit observed

> Count II of Ms. Monaghan's complaint asserted a Title VII retaliation claim against Worldpay.   Count III, a claim under 42 U.S.C. § 1981 for unlawful racial discrimination, mentioned retaliation in passing but only in a concluding paragraph alleging that Worldpay was liable for damages.   Count V, a claim for unlawful age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 623 *et seq.*, did not mention retaliation at all and did not cite to the Act's anti-retaliation provision, § 623(d) (internal citations omitted).

<u>Id.</u>   Despite both parties having treated the Complaint as if it contained retaliation claims under § 1981 and the ADEA at summary judgment, the Eleventh Circuit found that any such claims were not pled in the complaint and declined to address them on appeal.   <u>Id.</u> (citing <u>Miccosukee</u>, 716 F.3d at 559).

Similar to the parties in <u>Monaghan</u>, at the summary judgment stage both CSXT and Stapleton proceed as if Stapleton's Complaint potentially includes a claim for interference with medical treatment under 49 U.S.C. § 20109(c)(1).

See Motion at 22-34; see also Response at 18-19; see also Reply at 9-10. However, upon review of the Complaint, the Court has determined that he actually asserted no such claim.   Stapleton only mentions the terms "interference with medical treatment" in a conclusory sentence in a paragraph seeking damages under the heading, "Count Two: Retaliation Claims (49 U.S.C. § 20109(a))."   Complaint at 4.   He does not cite the interference with medical treatment provision under the FRSA and does not allege the factual predicate of the supposed claim.   See generally id.   As such, Stapleton did not plead a claim under 49 U.S.C. § 20109(c)(1) for interference with medical treatment in the Complaint and the Court will not permit Stapleton to amend his complaint to include such a claim at summary judgment.   Thus, to the extent CSXT seeks summary judgment on this claim, the Motion is due to be granted.

## B.     Retaliation under 49 U.S.C. § 20109(a)

In Count II of his Complaint, Stapleton generally alleges that in response to his reporting of a workplace injury, CSXT retaliated against him in violation of 49 U.S.C. § 20109(a)(4) by embarrassing and intimidating him, interfering with his medical treatment, and misclassifying his injury.   See Complaint at ¶ 33-36.   Specifically, he argues that CSXT retaliated against him when its employees accused him of dishonesty and the payroll department temporarily cancelled his health insurance benefits causing him to delay his surgery by a week to ten days.   See Response at 13.   In addition, he contends CSXT

retaliated against him when it initially classified his injury as non-FRA reportable deferring payment of his copays and deductibles for a period of less than three months until CSXT updated the classification and offered reimbursement.   See id.

The FRSA was enacted to promote railroad safety and reduce accidents and incidents. 49 U.S.C. § 20101. Congress subsequently added the anti-retaliation provisions of the act to protect railroad employees who notify authorities about violations of federal safety regulations pertaining to railroad operations.   Guerra v. Consol. Rail Corp., 936 F.3d 124, 127 (3d Cir. 2019) (citations omitted).   The relevant portion of the FRSA's anti-retaliation provision provides that a railroad carrier

> may not discharge, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due, in whole or in part, to the employee's lawful good faith act done, or perceived by the employer to have been done or about to be done . . . to notify, or attempt to notify, the railroad carrier or the Secretary of Transportation of a work-related personal injury or work-related illness of an employer.

49 U.S.C. § 20109(a), (a)(4).   A prima face case of retaliation under the FRSA requires a showing that (1) the employee engaged in a protected activity; (2) the railroad carrier knew or suspected that the employee engaged in the protected activity; (3) the employee suffered an adverse action; and (4) the circumstances permit an inference that the protected activity was a contributing factor in the adverse action.   29 C.F.R. § 1982.104(e)(2); see also 49 U.S.C. § 20109(d)(2)(A)

(incorporating by reference the rules and procedures set forth in 49 U.S.C. § 42121(b)).   If the employee establishes a prima facie case of retaliation, then the railroad carrier can avoid liability if it can show, by clear and convincing evidence, that it would have taken the same adverse action in the absence of plaintiff's protected activity. 29 C.F.R. § 1982.104(e)(4); Armstrong v. BNSF, 880 F.3d 377, 381 (7th Cir. 2018).

Stapleton generally asserts that CSXT retaliated against him by embarrassing him, intimidating him, and humiliating him.   Complaint at ¶ 33, 36.   While it is not entirely clear from the allegations in the Complaint, it appears from his deposition testimony that Stapleton is asserting that CSXT embarrassed, intimidated, and humiliated him by accusing him of dishonesty. Stapleton Deposition at 152.   Assuming, without deciding, that merely being accused of dishonesty can amount to an adverse employment action under the FRSA, the evidentiary record before the Court presents no factual basis to support this claim.   The evidentiary record does show that Stapleton felt he was being called dishonest when CSXT initially classified his incident as non-FRA reportable.   Id. at 145.   He also testified that the misclassification "made it seem like he was a liar."   Id. at 144.   Stapleton more specifically claims that he was made to feel dishonest by Delk.   Id. at 152.   He described that conversation as follows

In one of my conversations with Delk, when I was trying to

> understand why my injury was not being seen as FRA reportable, he explained it to me as if I had gone to lunch and while on lunch I was reading a newspaper.   When my lunch ended, I was done with the newspaper, so I decided to burn the newspaper.   And in burning the newspaper, caught myself on fire.   He's like you were hurt at work, but you weren't hurt while working.

Id. at 152-53.   However, Stapleton has not provided the Court with any evidentiary support for the allegation that any CSXT employee ever accused him of dishonesty.   Viewing the facts in a light most favorable to Stapleton, no reasonable juror could infer from this conversation that Delk was accusing Stapleton of dishonesty.   While Delk is giving an example of how an incident can occur at work yet still not constitute an FRA reportable injury, he suggests no dishonesty.   Although Stapleton may well have felt that he was being accused of dishonesty when CSXT did not immediately classify his injury as FRA reportable, the record reflects that this sentiment is a result of a misunderstanding on his part – but not on any statement or action by CSXT. As Dr. Heligman explained, there is a difference between whether an injury occurred "on-duty" or "at work" and whether that injury is FRA reportable.   Dr. Heligman Deposition at 25.   Stapleton does not suggest that anyone at CSXT ever accused him of misrepresenting how or when the injury occurred, only that its classification of the injury as non-FRA reportable made him feel he was being accused of dishonesty.   Stapleton's feelings notwithstanding, they are not sufficient to support a claim that CSXT engaged in any retaliatory conduct.

Stapleton also fails to present any factual basis to support a claim that CSXT retaliated against him by causing his health insurance coverage to be temporarily cancelled.  The undisputed record establishes that pursuant to CSXT policy, employees are responsible for notifying the payroll department when they are on leave.  <u>See</u> Sweatt Deposition at 10.  While Stapleton asserts that he was not aware he was supposed to notify the payroll department that he was on medical leave, Response at 6, he does not dispute that CSXT company policy required him to do so.  Stapleton also does not dispute that it was his failure to notify CSXT that he was on leave that caused the temporary discontinuation of his health insurance benefits.  In fact, at his deposition, Stapleton conceded that he does not know why his health insurance was cancelled and that he lacks any evidence that CSXT had UHC cancel his insurance as a way to retaliate against him.  Stapleton Deposition at 140-41.

At this, the summary judgment stage, Stapleton may not rest upon the mere allegations of his pleadings.  <u>See</u> <u>Rice-Lamar v. City of Ft. Lauderdale</u>, 232 F.3d 836, 840 (11th Cir. 2000).  Rather, Stapleton must "go beyond the pleadings, and by [his] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  <u>Jeffery</u>, 64 F.3d at 593-94 (internal citations and quotation marks omitted).  Stapleton has failed to do so here.  Therefore, summary judgment is to be entered in favor of CSXT with respect to any claim

that CSXT accused Stapleton of dishonesty or caused Stapleton's health insurance coverage to be temporarily cancelled in retaliation against him for reporting his workplace injury.

Last, Stapleton alleges that CSXT retaliated against him by delaying his receipt of a voluntary benefit that CSXT provides employees that suffer FRA reportable injuries.   Complaint at ¶ 35.   Specifically, Stapleton alleges that CSXT's provisional determination that his workplace injury was non-FRA reportable prevented him from having his copays and deductibles covered by CSXT for just under three months until CSXT updated the injury classification to FRA reportable and offered to reimburse him.   See id.   CSXT contends that the initial classification of Stapleton's injury, which ultimately resolved in his favor, does not amount to an adverse employment action.   Motion at 13. CSXT argues that in determining whether Stapleton suffered an adverse action, the Court should apply the definition of adverse action from Burlington, in reference to the United States Supreme Court decision interpreting the term adverse action in the context of a retaliation claim under Title VII.   Id. (quoting Burlington N. & Santa Fe Ry. Co., 548 U.S. 53, 59 (2006)).   CSXT cites to several federal district courts that have applied the Burlington standard to FRSA retaliation claims such as Sirois v. Long Island R.R. Co., 2018 WL 8963528, at *1 (E.D. N.Y. Aug. 24, 2018) aff'd on other grounds, 797 F. App'x 56 (2d Cir. 2020), Short v. Springfield Terminal Ry. Co., Civ. No. 2:16-CV-74-DBH,

2017 WL 3203391, at *1 (D. Me. July 26, 2017), Brisbois v. Soo Line R.R. Co., 124 F. Supp. 3d 891, 902 (D. Minn. 2015), and Renzi v. Union Pacific R.R. Co., Case No. 16 C 2641, 2018 WL 3970149, at *4 (N.D. Ill. Aug. 20, 2018)).   See id.

Under Burlington, to rise to the level of an adverse action the retaliatory act must be a "materially adverse" action, meaning an action that "well might have dissuaded a reasonable worker from [engaging in the protected activity]." Burlington, 548 U.S. at 68; Juback v. Michaels Stores, Inc., 143 F.Supp.3d 1195, 1206 (M.D. Fla. 2015).   CSXT argues that no reasonable juror could find that temporarily classifying Stapleton's injury as non-FRA reportable such that he had to pay for his copays and deductibles for less than three months and subsequently amending the classification to reportable and offering to reimburse Stapleton for any out-of-pocket costs he had incurred, would dissuade a reasonable worker from reporting an injury.   See Motion at 13-15.

In his Response, Stapleton argues that the Court should instead apply the Williams definition of an adverse action.   See Response at 9 (citing Williams v. Am. Airlines, Inc., ARB Case No. 09-018, ALJ Case No. 2007-AIR-004, 2010 WL 5535815 (DOL Adm. Rev. Bd.) (Dec. 29, 2010)).   In Williams, the Administrative Review Board (ARB) defined adverse actions as "unfavorable employment actions that are more than trivial, either as a single event or in combination with other deliberate employer actions alleged."   See Williams v. Am. Airlines, Inc., ARB Case No. 09-018, ALJ Case No. 2007-AIR-004, 2010 WL

5535815, at *7.   Stapleton contends that the Court should apply the Williams definition in evaluating the sufficiency of his retaliation claim under the FRSA because it was expressly adopted by the ARB as applied to FRSA claims in Fricka v. Nat'l R.R. Passenger Corp., ARB Case No. 14-047, ALJ Case No. 2013-FRS-035, 2015 WL 7904894 (DOL Adm. Rev. Bd.), at *4-5 (Nov. 24, 2015).   See Response at 9-10.   In support of applying the "more than trivial" standard established in Williams, the ARB in Fricka examined the language preceding the term "discriminate against" in the FRSA provision prohibiting retaliation. See Fricka, ARB Case No. 14-047, ALJ Case No. 2013-FRS-035, 2015 WL 7904894, at *4.   The ARB emphasized that under the FRSA, "[a] railroad carrier may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due" to the employee's engagement in protected conduct, including reporting a workplace injury.   See 49 U.S.C. § 20109(a) (emphasis added).   The ARB found that the inclusion of in any other way before discriminate against, suggested a clear congressional intent to prohibit a broader spectrum of adverse actions under the FRSA than under Title VII.   See Fricka, ARB Case No. 14-047, ALJ Case No. 2013-FRS-035, 2015 WL 7904894, at *4.   The ARB explained:

> Evaluating the respective statutory language of SOX[5], AIR 21[6], and FRSA, we conclude that the <u>Williams</u> definition of adverse personnel action also applies to FRSA claims.   FRSA, which prohibits   "discharge[ing],   demote[ing],   suspend[ing], reprimand[ing], <u>or in any other way discriminat[ing]</u> is virtually identical to the relevant broad statutory language in SOX (<u>in any manner discriminat[ing]</u>") and even broader than that of AIR 21.

<u>Id.</u>   Because the ARB applies the "more than trivial" standard to statutes like SOX and AIR 21, and the FRSA contains even broader statutory language than AIR 21, the ARB in <u>Fricka</u> reasoned that the lenient, "more than trivial" standard should apply to the FRSA.   <u>See id.</u>   Applying the <u>Williams</u> definition of the term "adverse employment action," Stapleton asserts that the temporary classification of his injury as non-FRA reportable resulting in his having to pay for his copays and deductibles out of pocket for over two months before being offered reimbursement through an "excessive" procedure is "more than trivial." <u>See</u> Stapleton Deposition at 151; <u>see also</u> Response at 9-13.   Alternatively, even if the Court applies the <u>Burlington</u> standard, Stapleton maintains that "material adversity is a question of fact for the jury so long as a reasonable jury could answer it either way."   Response at 12.

---

[5]     SOX refers to the whistleblower provisions of the Sarbanes Oxley Act in which companies cannot "discharge, demote, suspend, threaten, harass, or <u>in any other manner</u> discriminate against" employees who engage in protected activity. 18 U.S.C. § 1514A (emphasis added).

[6]     AIR 21 refers to the Wendell H. Ford Aviation Investment and Reform Act which prohibits retaliation against air carrier industry employees.   The language in AIR 21 states, <u>otherwise</u> discriminat[ing].   49 U.S.C. § 42121(a).

The Court recognizes the existence of some authority supporting the application of either the <u>Burlington</u> definition or the <u>Williams</u> definition to retaliation claims under the FRSA.  Because the Eleventh Circuit has not addressed the specific question of what the definition of an adverse action is in the context of the FRSA, the Court's decision is informed by persuasive authority from district courts that have considered the issue, as well as an analysis of the relevant statutes.

Since the ARB's decision in <u>Fricka</u>, some federal district courts have adopted its holding and applied the "more than trivial standard" to retaliation claims brought pursuant to the FRSA.  <u>See</u> <u>Perez v. BNSF Ry. Co.</u>, No. 18-00239-CV-W-BP, 2019 WL 4888627, at *3 (W.D. Mo. July 10, 2019); <u>see also</u> <u>Thomas v. Union Pac. R.R. Co.</u>, 203 F. Supp. 3d 1111, 1120 (D. Or. 2016).   In <u>Perez</u>, the Western District of Missouri noted that while the United States Supreme Court had interpreted "adverse action" under Title VII, neither the Eighth Circuit Court of Appeals nor the United States Supreme Court had the opportunity to interpret adverse action under the FRSA.  <u>Perez</u>, No. 18-00239-CV-W-BP, 2019 WL 4888627, at *3.  Without any significant analysis of the issue, and acknowledging a comparable amount of conflicting authority, the court concluded that the "weight of authority follows the <u>Williams</u> standard and interprets the 'adverse action' broadly under the FRSA."  <u>Id.</u>

In addition to citing to <u>Fricka</u>, the court cited <u>Thomas</u> from the District of

Oregon in which the court expressly rejected <u>Burlington</u> as applied to the FRSA and concluded that the ARB's holding in <u>Fricka</u> establishes the definition of an adverse action.   203 F. Supp. 3d at 1120.   The <u>Perez</u> court also cited two federal district court decisions published prior to the ARB's decision in <u>Fricka</u> that did not cite to the <u>Williams</u> "more than trivial" standard directly, but acknowledged that the FRSA is intended to offer broader protection.   <u>See</u> <u>Blackorby v. BNSF Ry. Co.</u>, No. 13-CV-00908-FJG, 2015 WL 58601, at *3 (W.D. Mo. Jan. 5, 2015); <u>see also</u> <u>Heim v. BNSF R. Co.</u>, No. 8:13-CV-369, 2015 WL 5775599, at *3 (D. Neb. Sept. 30, 2015), <u>aff'd sub nom.</u> <u>Heim v. BNSF Ry. Co.</u>, 849 F.3d 723 (8th Cir. 2017).

Despite the existence of this authority supporting the application of the <u>Williams</u> standard to retaliation claims brought under the FRSA, the Court finds that the weight of the authority as well as the language of the relevant anti-retaliation statutes support a conclusion that that the <u>Burlington</u> definition of adverse action under Title VII should be applied to retaliation claims under the FRSA.   The anti-retaliation provisions under both Title VII and the FRSA prohibit an employer from <u>discriminating against</u> an employee who engages in a protected activity.   Specifically, Title VII's anti-retaliation provision states, "[i]t shall be unlawful employment practice for an employer to <u>discriminate against</u> any of his employees or applicants for employment . . . " for opposing any unlawful employment practice or participating in an

investigation.   See 42 U.S.C. § 2000e-3(a).   The FRSA's provision states, "[a] railroad carrier "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee if such discrimination is due" to the employee's engagement in protected conduct, including reporting a workplace injury.   See 49 U.S.C. § 20109(a) (emphasis added).

While the Eleventh Circuit has not had cause to consider whether to apply the Burlington definition of adverse action to the FRSA, it has applied the Burlington standard to other similarly worded anti-retaliation statutes.   See Smith v. Haynes & Haynes P.C., 940 F.3d 635, 648 (11th Cir. 2019) (applying the Burlington standard in a retaliation claim under the Fair Labor Standards Act of 1938 § 15 (FLSA), 29 U.S.C. § 215(a)(3)); see Barnett v. Athens Reg'l Med. Ctr. Inc., 550 F. App'x 711, 713-14 (11th Cir. 2013) (applying Burlington in retaliation claims under Title VII, the ADEA, and § 1981); see Burgos v. Napolitano, 330 F. App'x. 187, 189-90 (11th Cir. 2009) (applying Burlington in evaluating a retaliation claim under the Rehabilitation Act, 29 U.S.C. § 791 et seq., which incorporates the anti-retaliation provisions of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12203(a)) (citations omitted).   Notably, the FLSA anti-retaliation provision states, "No employer shall discharge or in any manner discriminate . . . "   29 U.S.C. § 218c.   This language, "in any manner discriminate" is substantively indistinguishable from the FRSA's, "in any other way discriminate" language.   See 49 U.S.C. § 20109(a).   Because the Eleventh

Circuit did not find that the inclusion of the phrase, <u>in any manner</u> in the FLSA, required it to depart from the <u>Burlington</u> standard in <u>Smith</u>, the Court is not convinced that the inclusion of the phrase, <u>in any other way</u> in the FRSA, requires it to depart from the <u>Burlington</u> standard here.

Moreover, most federal courts that have considered a retaliation claim under the FRSA have found that the definition of the term adverse action from <u>Burlington</u> in the context of Title VII should apply to the FRSA.   <u>See</u> <u>Shearrer</u> <u>v.</u> <u>Norfolk S. Ry. Co.</u>, No. 2:19-CV-01062-JHE, 2021 WL 871356, at *5 (N.D. Ala. Mar. 9, 2021); <u>see also</u> <u>McCarty v. Norfolk S. Ry. Co.</u>, No. 2:18CV21, 2019 WL 8888163, at *1 (E.D. Va. Feb. 7, 2019); <u>see also</u> <u>Short</u>, No. 2:16-CV-74-DBH, 2017 WL 3203391, at *2; <u>see also</u> <u>Jones v. BNSF Ry. Co.</u>, No. 14-2616-JAR-KGG, 2016 WL 183514, at *6, n. 36 (D. Kan. Jan. 14, 2016); <u>see also</u> <u>Petronio v.</u> <u>Nat'l R.R. Passenger Corp.</u>, No. 19-CV-144 (JSR), 2019 WL 4857579, at *6 (S.D.N.Y. Oct. 2, 2019), <u>aff'd</u>, 836 F. App'x 39 (2d Cir. 2020) (applying <u>Burlington</u> under the FRSA and finding "this approach is consistent with how various other district courts addressed the issue in the FRSA context) (quoting <u>Renzi</u>, 2018 WL 3970149, at *4-5 and <u>Brisbois</u>, 124 F. Supp. 3d at 903).

Many of the courts that applied <u>Burlington</u> to define an adverse action in the context of an FRSA retaliation claim have reasoned that Title VII contains substantially similar language to the FRSA.   <u>See</u> <u>McCarty</u>, 2019 WL 8888163, at *1; <u>see also</u> <u>Short</u>, No. 2:16-CV-74-DBH, 2017 WL 3203391, at *2; <u>see also</u>

Renzi, No. 16 C 2641, 2018 WL 3970149, at *4; see also Sirois, 2018 WL 8963528, at *3.   For example in McCarty, the plaintiff alleged that he was disciplined by his railway employer for reporting excessive alcohol use by other employees and that his employer permitted other employees to engage in retaliatory harassment against him in violation of the FRSA.   McCarty, 2019 WL 8888163, at *1.   The defendant moved for summary judgment as to the plaintiff's retaliatory harassment claim, arguing that the plaintiff did not suffer an adverse employment action.   Id. at *15.   In determining whether the plaintiff alleged harassment sufficient to support a claim for retaliation under the FRSA, the court held that the Burlington standard of material adversity applied.   Id.   The court found that "the anti-retaliation provision at issue in Burlington contains similar language to the FRSA, in that it prohibits an employer from "discriminat[ing] against" an employee for engaging in a protected activity."   Id. (Comparing 42 U.S.C. § 2000e—3(a) with 49 U.S.C.A. § 20109).   In Short, the court similarly reasoned that the anti-retaliation language in Title VII, particularly the terms "discriminate against," parallel the language in the FRSA and thus the Burlington definition of an adverse action should apply.   See No. 2:16-CV-74-DBH, 2017 WL 3203391, at *2.   And in Renzi the court relied on Burlington in the context of an FRSA retaliation claim for the same reason.   See No. 16 C 2641, 2018 WL 3970149, at *4 (finding persuasive that the language in the FRSA is "quite similar" to Title VII in

applying the <u>Burlington</u> definition of adverse action).   <u>Id.</u>

In <u>Sirois</u>,[7] the court expressly rejected the ARB's interpretation in <u>Fricka</u>. No. 18-CV-3346 (BMC), 2018 WL 8963528, at *3.   The court found that it did not need to defer to the ARB's interpretation of "the term 'discriminate against' [because it] is not ambiguous when examined within the broader context of similar anti-retaliation statutes."   <u>Id.</u> at *4.   Similar to the Eleventh Circuit's application of <u>Burlington</u> to other statutes, the court emphasized that the Second Circuit applies the <u>Burlington</u> standard to define adverse actions under other anti-retaliation provisions such as those found in the ADEA, FMLA, and the ADA.   <u>Id.</u> at *2-3.   The court found no distinctions between the "discriminate against" language in each of the statutes to warrant the application of a different definition than the one identified in <u>Burlington</u>.   <u>Id.</u> at *3.

In consideration of the foregoing authority, the Court is persuaded that where Title VII and the FRSA share a common purpose of protecting employees from retaliation for exercising their rights provided by statute, and where the language in these statutes is substantially similar, the United States Supreme Court's standard for defining an adverse action under Title VII should also

---

[7]      The Court recognizes that the Second Circuit ultimately affirmed the Eastern District of New York on grounds other than the adverse action prong, as pointed out by Stapleton in his Response, and that the Second Circuit's analysis regarding <u>Burlington</u> as applied to the FRSA is merely dicta. Notwithstanding, the Court finds its examination of comparable statutes that apply <u>Burlington</u> helpful to its present analysis.

apply to the FRSA.   Thus, in the instant action brought under the FRSA, the Court must determine whether a reasonable jury could find that CSXT's actions "well might have dissuaded a reasonable employee from reporting their injury." See Burlington, 548 U.S. at 68.   Specifically, as to the classification of Stapleton's injury, the question is whether a reasonable jury could find that CSXT's initial classification of Stapleton's injury as non-FRA reportable for approximately two and a half months, causing him to pay his own copays and deductibles out of pocket during that time, and then ultimately updating the classification to FRA reportable and offering to reimburse his expenses, would dissuade a reasonable employee from reporting a workplace injury.   Here, the uncontested facts in the record dispel any possible inference that CSXT's initial classification of Stapleton's injury as non-FRA reportable would dissuade a reasonable worker from reporting his workplace injury.

The record establishes that CSXT has a voluntary policy to cover an employee's copays and deductibles incurred in connection with an injury suffered at work if CSXT determines the injury to be FRA reportable.   Dr. Heligman Deposition at 31.   In order for employees to avail themselves of this benefit, CSXT must learn of their work-related injury.   If CSXT does not know of the injury, the employee has no opportunity to have his copays and deductibles covered by CSXT and is responsible for paying them on his own.   Employees are thus incentivized to report their injuries and are in fact required

to report their injuries pursuant to CSXT's PI-1A form.    Stapleton Deposition, Ex. 6.

If CSXT initially classifies the injury as non-FRA reportable, even in error, the employee can have the decision reviewed by a committee and possibly changed in his favor.    Even if the non-FRA reportable determination remains unchanged, the employee has not lost anything from reporting the injury because an employee can only benefit from engaging in the protected activity in this context.    Stated another way, an employee is not worse off from having reported an injury that is then classified as non-FRA reportable than he would otherwise be from not reporting it at all.    As such, no reasonable jury could find that CSXT's non-FRA reportable determination, subject to review[8], would dissuade a reasonable employee from reporting their injury.

Notably, if an employee suffered an adverse action under the anti-retaliation provisions of the FRSA anytime a railroad employer initially determined the employee's injury to be non-FRA reportable while awaiting additional medical information, no railroad could ever classify an injury to be non-FRA reportable without subjecting itself to liability for retaliation under

---

[8]       To the extent Stapleton suggests that CSXT only initiated a review in this case because it was "caught" by the FRA, there is no evidence in the record to support such a claim.   See Response at 17.   Sweatt first mentioned reviewing Stapleton's injury more than two weeks before CSXT was first contacted by the FRA.   Sweatt Deposition at 89, Ex. 6(a). Additionally, Delk suggested to Stapleton that the reportability of his injury might be changed just three days after the initial reporting decision was made.   Stapleton Deposition, Ex. 10.

the FRSA.[9]   No reasonable interpretation of the language of the FRSA or its purpose would support a conclusion that anytime an injury is initially classified as non-FRA reportable, the railroad employer is engaging in unlawful retaliation against that employee.

Here, the undisputed facts establish that when Stapleton reported his injury in early May of 2017, CSXT initially determined that it was non-FRA reportable based on the medical records available to them at the time including Stapleton's denial that he suffered an injury.   Dr. Heligman explained that it is common to initially classify an event as non-FRA reportable if CSXT needs further medical records to determine otherwise.   Dr. Heligman Deposition at 124.   Within days of the initial classification, CSXT informed Stapleton that the decision would be subject to review.   Over the course of the next two and a half months, Stapleton paid for his copays and deductibles out of pocket, totaling $1,200, while CSXT sought further medical records and prepared to

---

[9]      Indeed, the burden shifting framework which applies to FRSA retaliation claims would be unworkable if this Court held that the initial and later corrected misclassification of an injury as non-reportable amounted to an adverse action.   If a plaintiff meets his burden of making out a prima facie case of retaliation under the FRSA, a defendant can avoid liability by proving by clear and convincing evidence that it would have taken the same adverse action in the absence of plaintiff engaging in the protected activity.   29 C.F.R. § 1982.104(e)(4); Armstrong, 880 F.3d at 381.   Applying that framework to the classification of an injury, no railroad could ever show it would have "taken the same adverse action" if the employee had not reported the injury at all.   Here, if Stapleton had not engaged in the protected activity – reported his injury – then CSXT would not have had occasion to classify his injury one way or the other.   The Court thus concludes that the FRSA's anti-retaliation provision does not reach an action such as this, where the alleged adverse action is the natural and necessary decision-making process the inevitably follows the protected activity.

send his case to its committee to reevaluate the reportability determination. Dr. Heligman testified that based on the initial information provided to him, "it was not clear that you could do a medical causation analysis, because there was no examination, there was no detailed medical history in the information we had, so it was important to have those medical records." Id. at 63.   As such, CSXT's reporting department requested additional medical records "to make an informed decision of FRA reportability" on several other occasions.   See Sweatt Deposition at 123-24.

Upon receipt of additional information including the emergency room records and the orthopedic records, Dr. Heligman provided an advisory opinion to the committee in late July of 2017.   Dr. Heligman Deposition at 123.   CSXT updated Stapleton's injury to FRA reportable and offered to reimburse any expenses that Stapleton incurred while CSXT was resolving the FRA reportability question.   According to Dr. Heligman, he could not have opined that Stapleton's injury could have been FRA reportable as an aggravation of a preexisting condition, without the medical records he received in late July.   Id. at 98.   Stapleton points to no evidence disputing this testimony.   Once CSXT had the adequate information to determine that Stapleton's injury was not a "personal condition" and that he "aggravated something," CSXT classified the injury as FRA reportable.   See Sweatt Deposition at 132.   Given these facts which are not in dispute, no reasonable juror could find that CSXT's actions

would dissuade a reasonable employee from reporting their injury because by reporting his injury Stapleton is now able to have his out of pocket medical costs that he would otherwise be responsible for on his own reimbursed by his employer.

Upon review of all the evidence and making all reasonable inferences in Stapleton's favor, <u>Haves</u> 52 F.3d at 921, the Court concludes no reasonable jury could find that Stapleton suffered an adverse action.  As such, the Court determines that summary judgment is appropriate because Stapleton is unable to establish a prima facie case of retaliation under 49 U.S.C. § 20109(a).  <u>See Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.</u>, 483 F.3d 1265, 1268 (11th Cir. 2007) (If '"the non-moving party fails to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof, then the court must enter summary judgment for the moving party."' (quoting <u>Gonzalez</u>, 161 F.3d at 1294 (alteration in original, additional citations omitted)).  In addition, any argument raised at summary judgment under 49 U.S.C. § 20109(c)(1) is not properly before this Court.  Thus, the Court has determined that CSXT's motion is due to be granted in its entirety and will enter summary judgment in favor of CSXT on Count II of the Complaint.

Accordingly, it is hereby

**ORDERED:**

1.     Defendant's Motion for Partial Summary Judgment as to Count II of the Complaint (Doc. 20) is **GRANTED**.

2.     The Court will defer entry of judgment as described above pending resolution of all remaining issues.

**DONE AND ORDERED** in Jacksonville, Florida on March 30, 2021.

**MARCIA MORALES HOWARD**
United States District Judge

lc28

Copies to:
Counsel of Record